IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 20, 2021

## STATE OF TENNESSEE v. JEREMIAH MCDANIEL

**Appeal from the Criminal Court for Monroe County**
**No. 17-322   Andrew M. Freiberg, Judge**

_____

### No. E2019-01862-CCA-R3-CD

_____

The Appellant, Jeremiah McDaniel, was convicted in the Monroe County Criminal Court of solicitation of a minor to commit sexual battery, a Class A misdemeanor, and received a sentence of one hundred eighty days to be served in jail.  On appeal, the Appellant contends that the trial court erred by constructively amending the indictment from solicitation of a minor to commit sexual battery by an authority figure to solicitation of a minor to commit sexual battery because sexual battery is not a lesser-included offense of sexual battery by an authority figure; that the evidence is insufficient to support the conviction because the evidence fails to show lack of consent; that the trial court should have dismissed the case or stricken the victim's trial testimony because the State failed to produce the victim's audio-recorded statement; that the trial court erred by admitting photographs of Facebook messages allegedly between the Appellant and the victim into evidence; that the trial court erred by limiting his cross-examination of the victim, by advising the victim of the victim's Fifth Amendment rights, and by allowing the victim to invoke those rights; and that his six-month sentence in confinement is excessive.  Based upon the record and the parties' briefs, we conclude that sexual battery without consent is not a lesser-included offense of sexual battery by an authority figure but that sexual battery without consent is a lesser-included offense of solicitation of a minor to commit sexual battery by an authority figure.  Therefore, the trial court properly instructed the jury on the lesser-included offense.  However, we also conclude that the evidence is insufficient to support the Appellant's conviction of solicitation of a minor to commit sexual battery.  Therefore, the conviction is reversed and vacated, and the original charge is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Vacated, Charge Dismissed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Jeremiah McDaniel.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Ashley Ervin and Clay Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual Background

In October 2017, the Monroe County Grand Jury indicted the Appellant for solicitation of a minor to commit sexual battery by an authority figure, a Class D felony. The minor was D.B., who was seventeen years old at the time of the alleged crime.[1] The Appellant went to trial on May 21, 2019.

At trial, the victim testified that he currently had a felony theft charge pending against him in Monroe County but that the State had not offered him anything in exchange for his testimony against the Appellant. The victim grew up in Madisonville, lived with his mother, and was never in the custody of the Department of Children's Services (DCS). However, he had been on probation in the juvenile court system. The victim was friends with A.M., who was the Appellant's adopted son, and the victim had spent the night in the Appellant's home. The Appellant was a caseworker for DCS. The victim never went on any trips with the Appellant's family, but he had talked with the Appellant about the Appellant's work.

The victim testified that on the night of May 23, 2017, he was at a residence next to the Catholic church in Madisonville and that his friend, J.B., was with him. The victim's cellular telephone received a written message from the Appellant "[t]hrough Messenger on Facebook," and they began sending written messages back and forth. The victim had never communicated with the Appellant via Facebook Messenger before that night. The State asked how the victim knew he was corresponding with the Appellant. The victim stated that the Appellant's profile picture was on the Appellant's messages and that the Appellant identified himself as A.M.'s "dad."

The victim testified that the Appellant asked through Messenger if the victim knew where J.B. was located. At that time, the Appellant was J.B.'s DCS caseworker, and J.B. was trying to avoid the Appellant because J.B. had failed a drug screen. The victim lied to the Appellant and responded that he did not know J.B.'s whereabouts. The Appellant asked if the victim was working, which the victim thought was unusual, and the victim responded

---

[1] We will refer to the victim and any individuals who may have been minors at the time of the crime by their initials to protect their identities.

that he was "doing a couple of odd jobs" like mowing grass. The Appellant told the victim that he "probably" knew of a way the victim could make some money. He then sent the following message to the victim: "'I pay you to let me jerk you off[.]'" The victim said the Appellant offered him money and "Xanaxes."

The victim testified that he used another cellular telephone to take photographs of the messages on his cellular telephone, and the State introduced the twelve photographs, labeled A through L, into evidence as collective Exhibit 1. The photographs showed as follows:[2]

You missed a call from Jeremiah
- Tue at 9:39 PM

CALL BACK

[The Appellant:] Hey this Jeremiah [A.M.'s] dad can u call me

[The victim:] Hello

[The Appellant:] You haven't seen [J.B.] have you or heard where he could be

[The victim:] No I haven't Im not friends with him. Did he do something?

[The Appellant:] He's in state custody and he ran away on a trial home placement apparently he's talking to this girl named Josie do you know anything about her I know she still lives in the trailer parks but she moved out [of] town and I have a word that he could be with her

. . . .

[The victim:] Yea I know her but I have [no] idea where she could be. If I find out where she's staying I'll [let you know]

[The Appellant:] OK thank you

---

[2] The photographs of the messages in Exhibit 1 appear to have been labeled out of order. Before trial, the State filed a motion in limine, requesting that the trial court find the Facebook messages admissible. The State attached the photographs, again labeled A through L, to its motion. We have chosen to show the messages in the order they appeared with the State's motion.

[The victim:]  No problem its good hearing from you!  Do you still remember who I am?

[The Appellant:]  Yes I do how have you been doing

[The victim:]  Good just a couple rough patches here and there

[The Appellant:]  R u working

[The victim:]  No but I mow a few peoples yards ever so often cause I have to help take care of my grandmother

[The Appellant:]  Well I may have some way for u to make some money

[The Appellant:]  Do u have a gf jw

[The Appellant:]  ?

[The victim:]  Nope single as [I] can be lol and that would be great of you I appreciate it

[The Appellant:]  Well I have 10 I could get to u <u>tonight</u> but . . .

[The Appellant:]  And I can give you some more <u>Friday</u> when I get paid

[The victim:]  What?

. . . .

[The Appellant:]  I pay u to let me jerk u off i'll bring you the money <u>tonight</u> [and] the rest Friday

[The victim:]  Just wait until tomorrow . . . so I can get all the money at once

[The Appellant:]  <u>Tomorrow</u>'s just Thursday

[The Appellant:]  And I swear to God I'm a man of my word I will pay you <u>on Friday</u>

[The Appellant:]  I'll even bring you a Xanax <u>tonight</u> to help you calm down

The victim testified that after he received the Appellant's messages, he "didn't know what to, how to really think about it at first." However, he and J.B. "started talking about it" and decided to have the Appellant meet the victim "at the Exxon." The victim said that he telephoned the Appellant to let the Appellant know where to meet him and that he recognized the Appellant's voice because he had talked with the Appellant on the telephone previously. The Appellant and the victim made plans to meet at the Exxon in Madisonville, go to an automatic teller machine (ATM), and go to the DCS office.

The victim testified that J.B. and a female named S.W. dropped him off at the Exxon. J.B. and S.W. then parked across the street. The Appellant was already at the Exxon, and the victim recognized the Appellant's vehicle because the victim had been in the vehicle previously. The victim got into the Appellant's vehicle, the Appellant drove to the ATM, and the Appellant withdrew one hundred dollars. The Appellant then drove to the DCS office parking lot. While the Appellant was driving, he asked if the victim "wanted to do any Xanax's before or after," and the victim answered, "[B]efore." The Appellant gave the victim a Xanax pill and "parked out back over that little bridge . . . looking thing." While the Appellant and the victim were sitting in the Appellant's vehicle, J.B. and S.W. pulled up. J.B. opened the Appellant's door, the victim got out of the passenger side of the Appellant's vehicle, and the victim ran to S.W.'s car "with the money." The victim and J.B. returned to the residence beside the Catholic church. The victim identified the Appellant in the courtroom as the man who picked him up at the Exxon.

On cross-examination, the victim acknowledged that the messages he exchanged with the Appellant were not dated. He said, though, that he was "pretty sure" they occurred on the night of May 23, 2017, and that he met the Appellant at the Exxon in the early morning hours of May 24, 2017. The victim later spoke with Detective Travis Jones. The victim said that he did not give his cellular telephone to Detective Jones because he "didn't want to" and acknowledged that he hid the telephone from the detective because he "didn't want anybody snooping through [his] phone." The victim said that he later broke his telephone and acknowledged that his telephone "disappeared." The victim used another cellular telephone to take the photographs of the messages he exchanged with the Appellant. The victim sent the photographs to J.B.'s mother.

The victim acknowledged that he lied to the Appellant about not knowing J.B.'s whereabouts. The victim said that although he and the Appellant did not discuss the victim's age, the Appellant "already knew my [age]." At the time of this incident, the victim and the Appellant were Facebook "friends," but the victim and the Appellant had never corresponded via Facebook Messenger. The victim acknowledged that the State was in the process of prosecuting him for theft and that the State had offered him diversion in that case.

On redirect-examination, the victim testified that the Appellant knew his age because the victim and A.M. were in the same grade at school. The victim said he did not give the Appellant's messages to law enforcement.

Travis Jones testified that in May 2017, he was a detective with the Monroe County Sheriff's Department (MCSD). At some point, Detective Jones received a referral from the DCS Special Investigations Unit about the Appellant's Facebook messages to the victim. Terry Ryan, a DCS investigator from Knoxville, worked with Detective Jones on the case.

Detective Jones testified that he "track[ed] down" J.B. and had J.B. interviewed at the Child Advocacy Center (CAC) by someone who specialized in forensic interviews. J.B. was "a runaway juvenile," and law enforcement took him into custody after his interview. The Appellant was thirty-three years old and worked for DCS in Madisonville. Detective Jones obtained the Appellant's bank records and video of the bank's ATM. Detective Jones did not try to obtain the Appellant's Facebook records, explaining that "I've tried to get Facebook records before, and Facebook basically tells you they don't recognize anything from Tennessee as far as subpoenas and they're not really cooperative at all." Detective Jones contacted the victim, but the victim refused to go to the CAC for an interview. Therefore, Detective Jones and Mr. Ryan met with the victim behind the Catholic church on Old Tellico Highway. Detective Jones audio recorded the victim's interview, but the interview was lost after Detective Jones left the MCSD to take other employment.

On cross-examination, Detective Jones testified that J.B.'s interview at the CAC occurred on May 25, 2017. Detective Jones said that he did not know J.B. was "drug screened" before the interview or that J.B. tested positive for amphetamine, methamphetamine, "benzos," and marijuana. Detective Jones interviewed the victim behind the Catholic church on May 30, 2017. J.B.'s mother was present for the victim's interview, and the victim's trial testimony differed from what he told Detective Jones. The victim did not show his cellular telephone to Detective Jones because the victim said he had "deleted everything off his phone." Detective Jones obtained J.B.'s cellular telephone for a forensic examination, but the telephone did not contain any relevant evidence. On redirect-examination, Detective Jones testified that DCS provided him with the photographs in Exhibit 1.

J.B. testified that at the time of the Appellant's trial, criminal charges were pending against him but that he had not discussed the charges with the State. When J.B. was sixteen years old, he went into DCS custody due to truancy and drug use. The Appellant was J.B.'s first caseworker and was J.B.'s caseworker in May 2017. J.B. had to meet with the

Appellant every month. J.B. said that he knew the Appellant previously because J.B. used to be best friends with the Appellant's son, A.M.

J.B. testified that on the night of May 23, 2017, he and the victim were at Abernathy Trailer Park in Madisonville. The Appellant texted the victim's telephone via Facebook, and the two of them exchanged multiple messages. The Appellant offered the victim "some Xanaxes" and one hundred dollars if the victim would let the Appellant "jerk [the victim] off." J.B. said that he and the victim "kind of played it along" and that he and S.W. dropped off the victim at the Skyway Market on Highway 411. The Appellant was parked at a gas pump, and the victim got into the Appellant's silver Toyota FJ Cruiser. When the Appellant pulled out of the Skyway parking lot, S.W. and J.B. followed him. The Appellant pulled into People's Bank, so S.W. and J.B. pulled into a Walmart parking lot. S.W. and J.B. then followed the Appellant and the victim to the DCS parking lot.

J.B. testified that he put on a ski mask and a toboggan because he was "on the run" from the Appellant. He ran to the Appellant's vehicle and "slung open" the driver's door. The Appellant "freaked out," and the victim got out of the Appellant's vehicle and ran. The victim got into S.W.'s vehicle, but J.B. "didn't catch up in time." The Appellant tried to block S.W.'s vehicle from leaving the parking lot, but S.W. and the victim managed to drive away. S.W. "backtracked" and picked up J.B. Later that night, the victim sent a text message to the Appellant, stating that he would not turn in the Appellant in exchange for five hundred dollars. The victim and the Appellant "met up," the Appellant gave the money to the victim, and the victim "split" the money with J.B.

On cross-examination, defense counsel asked if J.B. and the victim planned to rob the Appellant. J.B. answered, "No. After the messages sent to him and I seen how sick he was, then yes." J.B. said that he used his cellular telephone to take photographs of the Appellant's and the victim's messages and that he did not remember if he gave his telephone to Detective Jones. He acknowledged that he was taking amphetamine, methamphetamine, "benzos," and marijuana at the time of his CAC interview.

Christian Wade testified that he was an IT technician for People's Bank of East Tennessee and that he had access to the bank's video surveillance. Mr. Wade obtained video of the Madisonville branch's ATM for the early morning hours of May 24, 2017. The State played the video for the jury, and we have reviewed the video. The video shows that at 3:22 a.m. on May 24, 2017, a silver Toyota FJ Cruiser stopped at the ATM. The driver, a white male, obtained cash from the machine. The passenger side of the vehicle was not visible.

At the conclusion of Mr. Wade's testimony, the State rested its case, and defense counsel made a motion for judgment of acquittal on the basis that the State failed to prove

that the Appellant was an authority figure to the victim. The trial court granted the Appellant's motion for judgment of acquittal on the indicted offense of solicitation of a minor to commit sexual battery by an authority figure but submitted the case to the jury on the lesser-included offense of solicitation of a minor to commit sexual battery. The jury convicted the Appellant of that offense, a Class A misdemeanor, and the trial court sentenced him to six months in jail.

## II. Analysis

### A. Lesser-Included Offense

The Appellant contends that the trial court committed reversible error by constructively amending the indictment to solicitation of a minor to commit sexual battery because sexual battery is not a lesser-included offense of sexual battery by an authority figure. The State argues that the trial court properly instructed the jury on solicitation of a minor to commit sexual battery. We conclude that sexual battery without consent is not a lesser-included offense of sexual battery by an authority figure but that sexual battery without consent is a lesser-included offense of solicitation of a minor to commit sexual battery by an authority figure. Therefore, the trial court did not err by instructing the jury on solicitation of a minor to commit sexual battery without consent.

At the conclusion of the State's proof, the Appellant made a motion for judgment of acquittal. In a memorandum of law submitted to the trial court, the Appellant argued that the State failed to show he was an authority figure to the victim because he did not hold a position of trust with the victim or have supervisory authority or disciplinary power over the victim as a DCS employee. The State also filed a memorandum, arguing that the Appellant held a position of trust with the victim because the victim "knew the defendant not only as a DCS worker but also as the father of a close friend." The trial court agreed with the Appellant and found that "the authority figure element is lacking." However, the trial court concluded, over the objections of both the Appellant and the State, that sexual battery without consent was a lesser-included offense of sexual battery by an authority figure.

First, the trial court noted that this court "explicitly" stated in two cases that sexual battery was a lesser-included offense of sexual battery by an authority figure. Specifically, this court stated in State v. Billy Ramer, No. W2015-01692-CCA-R3-CD, 2016 WL 1446108, at *1 (Tenn. Crim. App. at Jackson, Apr. 12, 2016), that the defendant was charged with sexual battery by an authority figure but "pled guilty to the lesser-included offense of sexual battery." In State v. Travis Lurry, No. W2010-01932-CCA-R3-CD, 2011 WL 2698317, at *2 (Tenn. Crim. App. at Jackson, July 12, 2011), this court stated that the

- 8 -

trial court vacated the defendant's jury conviction of sexual battery by an authority figure but found the defendant "guilty of the lesser-included offense of sexual battery."

The trial court also concluded that sexual battery without consent was a lesser-included offense of sexual battery by an authority figure pursuant to State v. Burns, 6 S.W.3d 453 (Tenn. 1999). The trial court explained,

> I don't think that they have two different elements under the [Burns] test. . . . [S]exual battery by an authority figure, if you go under the part the victim was at the time of the offense 13 years of age or older but less than 18 years of age, and if you look at sexual battery, 39-13-505(a)(2) where it talks about consent and the defendant knows or had reason to know that the contact, the victim did not consent. What's alleged in this case is money for a handjob. It is a pay for play. It is alleged as a transaction. And a minor cannot consent, I don't believe, under our laws. And then it becomes, well, did the defendant know or have reason to know that the victim did not consent? And that would go to the age.

Accordingly, the trial court granted the Appellant's motion for judgment of acquittal as to the indicted offense of solicitation of a minor to commit sexual battery by an authority figure but ruled that it was going to submit the case to the jury on the offense of solicitation of a minor to commit sexual battery.

During the final charge, the trial court instructed the jury on sexual battery under a theory of force or coercion and under a theory of lack of consent. See Tenn. Code Ann. § 39-13-505(a)(1), (2). The State subsequently argued in its closing argument that force or coercion did not exist in this case and that the jury should find the Appellant guilty based on the "alternative" element, lack of consent. Therefore, based on the trial court's ruling and the State's closing argument, the issue before us is whether solicitation of a minor to commit sexual battery without consent is a lesser-included offense of solicitation of a minor to commit sexual battery by an authority figure. The first question we must address is whether the trial court properly determined that sexual battery without consent is a lesser-included offense of sexual battery by an authority figure. We note that while this court stated, in dicta, in Billy Ramer and Travis Lurry that sexual battery is a lesser-included offense, this court has never analyzed the issue.

In Burns, our supreme court set out a three-part test for determining whether an offense was a lesser-included offense of the charged offense. Part (a) provided that an offense was a lesser-included offense if all of its statutory elements were included within the statutory elements of the offense charged. Burns, 6 S.W.3d at 466. Part (b) provided that an offense was a lesser-included offense if it failed to meet the definition in part (a)

only because it contained a statutory element or elements establishing (1) a different mental state indicating a lesser kind of culpability and/or (2) a less serious harm or risk of harm to the same person, property, or public interest.  Id. at 466-67.  Finally, part (c) provided that an offense was a lesser-included offense if it consisted of facilitation, attempt, or solicitation of the offense charged.  Id. at 467.  The trial court was to instruct the jury on all lesser-included offenses if the evidence was legally sufficient to support a conviction for the lesser-included offense.  Id. at 469.

In 2009, Tennessee Code Annotated section 40-18-110(f) was amended to provide that an offense is a lesser-included offense if:

> (1) All of its statutory elements are included within the statutory elements of the offense charged;
>
> (2) The offense is facilitation of the offense charged or of an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1);
>
> (3) The offense is an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1); or
>
> (4) The offense is solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser included offense in subdivision (f)(1).

"Subsection (f) effectively codified parts (a) and (c) of the Burns test."  State v. Howard, 504 S.W.3d 260, 269 (Tenn. 2016).  Furthermore, subsection (g) was added to specify certain lesser-included offenses.  See Tenn. Code Ann. § 40-18-110(g) (providing that second degree murder is a lesser-included offense of first degree murder, voluntary manslaughter is a lesser-included offense of first degree premeditated murder and second degree murder, aggravated sexual battery is a lesser-included offense of aggravated rape, and sexual battery and sexual battery by an authority figure are lesser-included offenses of rape and aggravated rape).  In Howard, our supreme court determined that subsections (f) and (g) did not abrogate part (b) of the Burns test and that part (b) continues to be applicable to determining whether an offense is a lesser-included offense.  Id. at 270.

As to the offense of solicitation of a minor, Tennessee Code Annotated section 39-13-528(a)(5), (6) provides that

- 10 -

[i]t is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age, or solicits a law enforcement officer posing as a minor, and whom the person making the solicitation reasonably believes to be less than eighteen (18) years of age, to engage in conduct that, if completed, would constitute a violation by the soliciting adult of [sexual battery by an authority figure or sexual battery.]

Relevant to this case, sexual battery by an authority figure is defined as "unlawful sexual contact with a victim by the defendant" if "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age" and "[t]he defendant was at the time of the offense in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact." Tenn. Code Ann. § 39-13-527(a)(1), (3)(A). Sexual battery, in relevant part, is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and "[t]he sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent[.]" Tenn. Code Ann. § 39-13-505(a)(2).

Solicitation of a minor to commit sexual battery by an authority figure is a Class D felony whereas solicitation of a minor to commit sexual battery is a Class A misdemeanor. See Tenn. Code Ann. §§ 39-13-505(c), -527(b), -528(c). We note that it is not a defense to a solicitation charge that "the solicitation was unsuccessful [or] that the conduct solicited was not engaged in." Tenn. Code Ann. § 39-13-528(b).

In this case, the trial court found that all of the statutory elements in sexual battery were included within the statutory elements of sexual battery by an authority figure. In comparing the elements of the two offenses pursuant to Tennessee Code Annotated section 40-18-110(f)(1), both require unlawful sexual contact. The greater offense of sexual battery by an authority figure also requires that the victim be thirteen to seventeen years old and that the defendant be an authority figure to the victim. Sexual battery does not contain an age element for the victim but contains an element that the sexual contact was accomplished without the victim's consent and the defendant knew or had reason to know at the time of the contact that the victim did not consent. The trial court reasoned that the lack-of-consent element in sexual battery was satisfied by the age element in sexual battery by an authority figure because the trial court found that a minor cannot consent to sex.

- 11 -

A minor cannot consent to any form of statutory rape.  State v. Collier, 411 S.W.3d 886, 899 (Tenn. 2013).  Likewise, a minor cannot consent to rape of a child.  State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994).  Against that backdrop, this court has held that a minor cannot consent to rape by coercion, which is the unlawful sexual penetration of the victim accompanied by the use of parental, custodial, or official authority over a child less than fifteen years of age.  State v. Tarrants Chandler, No. M2013-00279-CCA-R3-CD, 2014 WL 3055972, at *18 (Tenn. Crim. App. at Nashville, July 7, 2014) (citing Tenn. Code Ann. §§ 30-13-501(1), -503(a)(1)).  As this court explained in Tarrants Chandler,

> Similarly to the crime of rape by coercion, the crimes of rape of a child and statutory rape all impose an age limitation on the victim.  See [Tenn. Code Ann.] § 39-13-501(1) (defining coercion as "the use of parental, custodial, or official authority over a child less than fifteen (15) years of age"); [Tenn. Code Ann.] § 39-13-522(a) (victim of rape of a child is more than three but less than thirteen years of age); [Tenn. Code Ann.] § 39-13-506(b)(1), (2) (victim of statutory rape at least thirteen but less than eighteen years of age); Collier, 411 S.W.3d at 899.  The legislature specifically included the age restriction of "less than fifteen years" for the crime of rape by coercion.  This age restriction is indicative of an intent to create a specific offense when the victim is less than fifteen years old, much like rape of a child and statutory rape are age[-]specific offenses.  Because a minor victim may not consent to the crimes of rape of a child or statutory rape, it follows that a minor victim also may not consent to rape by coercion.  See Collier, 411 S.W.3d at 899. We see no reason to conclude that a [fourteen-year-old] who would be incapable of consenting to a statutory rape would somehow be capable of consenting to a rape by coercion.  Such a conclusion is contradictory to the special protections that the legislature and supreme court have carved out for sexual offenses committed against minors.  Therefore, it was not error for the trial court to exclude the defense of consent, and the defendant is not entitled to any relief on this claim.

Id.

We agree with this court's reasoning in Tarrants Chandler.  The legislature specifically included the age restriction of "thirteen (13) years of age or older but less then eighteen (18) years of age" for the crime of sexual battery by an authority figure.  The age restriction indicates that the legislature intended to create an age-specific offense when the victim is thirteen to seventeen years old, just as the legislature intended to create the age-specific offenses of rape of a child, statutory rape, and rape by coercion.  Because a minor victim may not consent to any of those crimes, it follows that a minor victim also may not

consent to sexual battery by an authority figure. Therefore, it would appear that the lack-of-consent element in sexual battery corresponds to the age element in sexual battery by an authority figure. However, the lack-of-consent element in sexual battery also requires that the defendant knew or had reason to know at the time of the contact that the victim did not consent. The age element in sexual battery by an authority figure does not require that the defendant knew or had reason to know the victim's age. Accordingly, we conclude that sexual battery without consent is not a lesser-included offense of sexual battery by an authority figure under Tennessee Code Annotated section 40-18-110(f)(1).

That said, the Appellant was indicted for solicitation of a minor to commit sexual battery by an authority figure. Solicitation of a minor requires that a defendant knew or should have known that the victim was less than eighteen years old. Therefore, we think that all of the statutory elements in sexual battery without consent are incorporated into the elements of solicitation of a minor to commit sexual battery by an authority figure and that the former is a lesser-included offense of the latter under Tennessee Code Annotated section 40-18-110(f)(1). Thus, the trial court did not err by instructing the jury on solicitation of a minor to commit sexual battery without consent as a lesser-included offense of solicitation of a minor to commit sexual battery by an authority figure.

## B. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support his conviction of solicitation of a minor to commit sexual battery because the proof fails to show lack of consent. The State argues that the evidence is sufficient because the Appellant offered, and the victim accepted, the "mood altering" drug Xanax, which "indicated" to the Appellant that the victim was not "fully on board" with having sexual contact with the Appellant. We agree with the Appellant that the evidence is insufficient to support the conviction.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of

- 13 -

innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As stated previously, the statute for solicitation of a minor to commit sexual battery provides that

> [i]t is an offense for a person eighteen (18) years of age or older, by means of oral, written or electronic communication, electronic mail or internet services, directly or through another, to intentionally command, request, hire, persuade, invite or attempt to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age . . . to engage in conduct that, if completed, would constitute . . . [s]exual battery[.]

Tenn. Code Ann. § 39-13-528(a)(6). Sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" and "[t]he sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent[.]" Tenn. Code Ann. § 39-13-505(a)(2). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

In State v. Denny Merrill Phillips, the defendant was charged with solicitation of a minor to commit rape, which was defined in that case as unlawful sexual penetration of the victim by the defendant or the defendant by the victim "'accompanied by any of the following circumstances,' one of which is the 'sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the

penetration that the victim did not consent.'" No. E2010-02233-CCA-R3-CD, 2012 WL 765216, at *5 (Tenn. Crim. App. at Knoxville, Mar. 12, 2012) (citing Tenn. Code Ann. § 39-13-503(a)(2)). At trial, the evidence showed that the forty-year-old defendant followed the sixteen-year-old male victim into the bathroom at Cove Lake Park twice. See Denny Merrill Phillips, No. E2010-02233-CCA-R3-CD, 2012 WL 765216, at *1-3. The first time, the defendant did not say anything to the victim. Id. at *1. However, the second time, the defendant asked if the victim "'would like to give [the defendant] a blow job.'" Id. at *2. The victim told him no, so the defendant offered to pay the victim one hundred dollars. Id. The victim again said no and telephoned 911. Id. The jury convicted the defendant as charged of solicitation of a minor to commit rape. Id. at *4.

On appeal, the defendant claimed that the evidence was insufficient to support the conviction because the State "failed to present any facts or evidence to the jury from which it could have reasonably concluded that the sexual penetration solicited by the defendant would have occurred without the victim's consent." Id. at 6. The State argued that the victim's lack of consent was established by his telling the defendant no after the first solicitation; therefore, the defendant knew when he offered the victim one hundred dollars that any sex act that occurred would be without the victim's consent. Id. This court agreed with the defendant that the evidence was insufficient, explaining,

> The precise words used by the defendant lend themselves most naturally to an interpretation that the defendant would not have engaged in a sex act with the victim without the victim's consent. The victim testified that the defendant asked him if he would "like" to give him a "blow job," which implies that a sex act would only occur if the victim desired it. The victim further testified that the defendant offered to give him $100, which would also imply that the defendant was soliciting a consensual sex act and that no sex act would occur without the victim's agreement to do so in exchange for money.
>
> . . . .
>
> The defendant made no statement to the victim, police, or anyone else indicating that he intended to engage in a sex act with the victim without the victim's consent. He did not physically touch the victim. There is no evidence in the record that the defendant carried rope, duct tape, or other material for restraining the victim or that the defendant had a weapon of any sort. When the victim refused his advances, the defendant made no effort to prevent him from leaving and made no attempt to follow him. The victim was even afforded the opportunity to photograph the defendant's license plate before he escaped. In short, there is no evidence in this case that the

defendant solicited the victim with the intention of raping him without his consent.

Id.[3]

Turning to the instant case, the Appellant sent a message to the victim in which the Appellant offered the victim one hundred dollars if the victim would "let" the Appellant touch the victim's penis. The Appellant also offered the victim Xanax to help the victim calm down. Although the State asserts that the Appellant's offering the victim Xanax to calm down is proof that the Appellant knew or should have known that the victim did not consent, the victim testified that the Xanax was part of the payment for the sexual act and that the Appellant asked if he wanted to take the Xanax "before or after" the sexual contact. Moreover, there was no evidence that the Appellant needed the Xanax to overcome the victim's lack of consent because unlike the victim in Denny Merrill Phillips, the victim in this case expressed consent. The victim responded to the Appellant's solicitation by stating that he wanted "all of the money at once." The victim then spoke with the Appellant on the telephone, agreed to meet the Appellant at the Exxon, got into the Appellant's vehicle, consumed the Xanax offered by the Appellant, and accepted the Appellant's payment of one hundred dollars. Although the victim apparently had no intentions of going through with the sexual contact, he certainly indicated to the Appellant that he was willing to participate right up until J.B. opened the driver's door of the Appellant's vehicle. The Appellant never made any statements indicating that he intended to engage in a sex act with the victim without the victim's consent, he did not touch the victim, and he did not try to stop the victim from exiting his vehicle. Although the Appellant tried to stop S.W.'s vehicle from leaving the parking lot, the victim had just taken the Appellant's money. Therefore, we must conclude that there is no evidence in this case that the Appellant solicited the victim with the intention of committing sexual battery without the victim's consent. Accordingly, the Appellant's conviction is reversed and vacated, and the original charge against him is dismissed. Despite this conclusion, we will address the Appellant's remaining claims in the event of further appellate review.

## C. Victim's Recorded Statement

The Appellant claims that the trial court should have dismissed the indictment against him or should have stricken the victim's trial testimony because the State failed to preserve the victim's audio-recorded statement to Detective Jones. The State argues that

---

[3] This court found, though, that the evidence was sufficient to support a conviction of solicitation of a minor to commit statutory rape. Id. at *1. However, given that statutory rape is not a lesser-included offense of rape, this court concluded that the defendant's conviction could not be amended to solicitation of a minor to commit statutory rape. Id.

the trial court properly remedied the situation with a simple jury instruction. We conclude that the Appellant is not entitled to relief on this issue.

Before trial, the Appellant filed a motion to prohibit the victim from testifying at trial pursuant to Tennessee Rule of Criminal Procedure 26.2 and filed a motion to dismiss the charge against him pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), because the State negligently destroyed the victim's audio-recorded interview with Detective Jones. In a pretrial hearing, the victim testified for the State that he showed the messages on his telephone to Detective Jones. On cross-examination, the victim testified that he was "pretty sure" he showed the messages to the detective and that he later broke his telephone. At the conclusion of the victim's hearing testimony, defense counsel requested the victim's recorded statement to Detective Jones, and the trial court stated that "there is no statement to produce."[4]

Detective Jones testified for the Appellant at the hearing. Detective Jones said that the victim did not show him any messages. On cross-examination, Detective Jones testified that he received the photographs of the messages from DCS and that he showed the photographs to the victim during the victim's May 30 interview. Detective Jones did not attempt to obtain the victim's telephone because the victim claimed he had deleted the messages from the telephone. Detective Jones said that he audio recorded the victim's interview and that the recording would confirm that he showed the photographs to the victim. Detective Jones stated that he downloaded the audio-recorded interview onto his computer but that the recording no longer existed. An "IT guy" from the sheriff's department tried to obtain the recording from Detective Jones's computer but was unable to do so. At the conclusion of the hearing, the trial court ruled that the State did not violate Tennessee Rule of Criminal Procedure 26.2. Specifically, the trial court found that the recording no longer existed; therefore, the State was not "disobeying" an order to deliver the victim's statement to the defense.

In a subsequent hearing, the trial court addressed the Ferguson issue. During the hearing, the State advised the trial court that two written summaries of the lost interview existed. The State then had J.B. and Dustin Atkins, the Chief Operating Officer for People's Bank of East Tennessee, testify. After their testimony, the trial court found that the lost recording was exculpatory because the Appellant could have used the recording to impeach the victim at trial. The trial court found, though, that the recording was lost due to simple negligence. The trial court also found that the lost evidence was not particularly significant given the written summaries of the interview and the fact that the victim, Detective Jones, and Mr. Ryan could testify about the interview at trial. Finally, the trial court addressed the sufficiency of the other evidence the State would present at trial to

---

[4] Defense counsel also requested the victim's statement at the conclusion of his trial testimony.

support a conviction. The trial court noted that J.B. was going to testify about the messages sent by the Appellant and that the State was going to present evidence that the Appellant withdrew money from Peoples Bank at 3:00 a.m. The trial court found that in light of the Ferguson factors, a trial without the recording would not lack fundamental fairness and refused to dismiss the indictment. However, the trial court stated that it was going to "craft" a jury instruction because "I do think that a jury instruction would be sufficient to cure any ill that exists as a result of the negligence in the destruction or misplacement of that interview." During the final jury charge, the trial court instructed the jurors that they could infer the missing evidence would have been favorable to the Appellant. On appeal, the Appellant maintains that the trial court should have prohibited the victim from testifying at trial pursuant to Tennessee Rule of Criminal Procedure 26.2 and that the trial court should have dismissed the charge against him pursuant to Ferguson.

Regarding the victim's testimony, Tennessee Rules of Criminal Procedure 26.2(a), commonly referred to as the Jencks Rule, provides that after a witness has testified on direct examination, the opposing party can make a motion to receive any statement made by the witness that is in the possession of the party who called the witness and relates to the witness's testimony. "If the party who called the witness disobeys an order to deliver a statement, the court shall strike the witness's testimony from the record and order the trial to proceed." Tenn. R. Crim. P. 26.2(d). In this case, the trial court found that the statement had been lost and, therefore, did not order the State to turn it over to the defense. Thus, we agree with the trial court that the State did not violate the plain language of Rule 26.2 because the State did not "disobey" an order to deliver the statement. See State v. Ronald Wayne Gilbert, No. E2017-00396-CCA-R3-CD, 2018 WL 2411835, at *5 (Tenn. Crim. App. at Knoxville, May 29, 2018) (stating that "the sanctions prescribed by the rule are only applicable when the State disobeys a court order to deliver the statement"). Accordingly, we conclude that the trial court did not abuse its discretion by refusing to strike the victim's trial testimony. See State v. Danny Howard, No. W2012-02109-CCA-R3-CD, 2013 WL 6254679, at *13 (Tenn. Crim. App. at Jackson, Dec. 2, 2013) (applying abuse of discretion standard for review of Rule 26.2 violation).

Regarding the trial court's failure to dismiss the charge against the Appellant, the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been

exculpatory. 2 S.W.3d at 915-18. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> [w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id. This court reviews the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. State v. Merriman, 410 S.W.3d 779, 791 (Tenn. 2013). We review the appropriateness of the remedy provided by the trial court under an abuse of discretion. Id.

The victim initially testified at the pretrial hearing that he showed the messages on his telephone to Detective Jones. The victim later testified that he was "pretty sure" he showed the messages to the detective. Detective Jones testified that he obtained the photographs of the messages from DCS, that he showed the photographs to the victim, and that the victim's audio-recorded interview would have confirmed that he showed the

- 19 -

messages to the victim, not vice versa. We note that Detective Jones testified at trial that the victim's interview differed from the victim's trial testimony; however, Detective Jones but did not explain how the victim's interview differed from the victim's testimony. In any event, to the extent that the Appellant could have used the victim's audio-recorded interview to impeach the victim, the State had a duty to preserve the evidence.

Regarding negligence, the record shows that Detective Jones downloaded the recording onto his computer but that the recording was lost when Detective Jones left his job at the MCSD to take employment at another agency. The record does not indicate anything more than simple negligence. As to the significance of the lost evidence, the record does not demonstrate that the lost recording was particularly damaging to the State or particularly helpful to the defense because the victim testified on cross-examination that he was just "pretty sure" he showed the photographs to Detective Jones. Moreover, our determination of the significance of the lost evidence is curtailed because Detective Jones did not testify at the hearing or at trial about what else the victim told him on May 30. In any event, the State advised the trial court that summaries of the lost recording were available to the Appellant. Finally, despite our ruling that the State failed to prove lack of consent, the State's evidence was very damaging to the Appellant. The victim and J.B. testified about the messages exchanged between the Appellant and the victim, the State introduced the messages into evidence, and the State presented surveillance video from the Appellant's bank that supported the victim's and J.B.'s testimony. Therefore, in balancing the Ferguson factors, we conclude that the loss of the recording did not deprive the Appellant of a fair trial. We also conclude that the trial court did not abuse its discretion by choosing to instruct the jurors that they could infer the missing evidence was favorable to the Appellant as an appropriate remedy for the loss of the recording. Thus, the Appellant is not entitled to relief on this issue.

## D. Admissibility of Photographs

The Appellant claims that the trial court erred by allowing the State to introduce the photographs of the Facebook messages into evidence because the messages were not properly authenticated pursuant to Tennessee Rule of Evidence 901(a). The State argues that the trial court did not err. We agree with the State.

Prior to trial, the State filed a motion in limine, requesting a ruling on the admissibility of the photographs of the Facebook messages. In a pretrial hearing, the victim testified about receiving the Facebook messages from the Appellant, and his hearing testimony was essentially the same as his trial testimony. The State showed the victim twelve images in Exhibit 1. The images were labeled A through L, and the victim identified them as "the messages between me and Jeremiah" that appeared on the victim's cellular telephone. The victim said that he and J.B. took "screenshots" of the messages with another

telephone and that the victim sent the screenshots to J.B.'s mother. On cross-examination, the victim clarified that the images were photographs, not screenshots, of the messages on his telephone and that he took the photographs with another telephone. The victim said that he later ran over his telephone with a skateboard, breaking the telephone, and that he no longer had access to that particular Facebook account because he could not remember his password. The victim said that the Appellant's profile picture appeared next to each one of the Appellant's messages. The victim acknowledged that the Appellant's name and profile picture were the only way to identify the messages as coming from the Appellant, that the Appellant's telephone number did not appear with the messages, and that no date appeared on the messages.

Detective Jones also testified at the pretrial hearing. He said he obtained the photographs in Exhibit 1 from DCS and that it was his understanding J.B. used J.B.'s telephone to photograph the messages on the victim's telephone.

At the conclusion of the hearing, the trial court found the "[Linzy] case very persuasive and a good kind of recitation of the law." The trial court noted that "[t]here was some confusion" as to whether the images in Exhibit 1 were screenshots captured by the victim's telephone or photographs taken by J.B.'s telephone. The trial court determined that the images were photographs but accredited the victim's testimony that he and the Appellant exchanged the Facebook messages in the photographs. The trial court then stated as follows:

> I also want to note some things about the appearance and contents [of the messages]. If you look at Exhibit 1 A, this Court has the ability to take judicial notice of things which are inherent, like a calendar. And the indictment in this case charges the Defendant with solicitation on or between the 23rd and 24th day of May 2017. Taking judicial notice of 2017, it is noteworthy to the Court that May 23rd is a Tuesday. When you look at Exhibit 1 A, missed call from Jeremiah on Tuesday at 9:39 p.m. So the indictment date in which he says this existed and when it began and what it purported to be is also corroborated by the fact that the calendar, based upon the indictment on that same day, is a Tuesday. And this screenshot shows that it is a Tuesday. I also want to note that . . . the name Jeremiah McDaniel is on it. Hey, this is Jeremiah, [A.M's] dad. Can you call me? And also the bubbles were a profile picture of Mr. McDaniel.

Finally, the trial court noted that the Appellant's messages contained information that would have been known by the Appellant. For example, the messages stated that J.B. was in State custody but had run away and that J.B. was talking to a girl who lived in a trailer park. Therefore, the trial court ruled that Exhibit 1 was admissible at trial.

- 21 -

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Whether evidence has been sufficiently authenticated is within the trial court's sound discretion, and its decision will not be overturned absent an abuse of discretion. See State v. Mickens, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).

"A trial court has broad discretion regarding the admissibility of photographs. State v. Davidson, 509 S.W.3d 156, 198 (Tenn. 2016) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)). "Before a photograph is admissible, it must be verified and authenticated by a knowledgeable witness." Id. (citing Banks, 564 S.W.2d at 949). Generally, "[a] photograph can b[e] authenticated by proof that it depicts what it is claimed to depict, Rule 901(a)." Neil P. Cohen at al., Tennessee Law of Evidence, § 4.01[21][e] (6th ed. 2011). However,

> [i]t is not necessary . . . that the witness through whom a photo is being introduced was also the photographer who took the photo in question. Any person, whether or not the photographer, familiar with the place or item that was photographed can authenticate the picture by testifying that it is a true and accurate depiction of the location or item at issue in the case.

Id.

In State v. Jabriel Linzy, the State sought to introduce messages found on Facebook and Twitter. No. E2016-01052-CCA-R3-CD, 2017 WL 3575871, at *1 (Tenn. Crim. App. at Knoxville, Aug. 18, 2017). The messages reflected that the defendant and the victim were members of rival gangs and that the defendant had issued threats against the victim. Id. at *13. The defendant argued that the comments could not be attributed to him; in other words, the comments could not be authenticated. Id. at *11. This court stated that "evidence from social media and emails was authenticated when the prosecution offered corroborating circumstantial evidence." Id. at *12. The corroborating circumstantial evidence consisted of a witness who knew the defendant's Twitter account, a witness who knew the victim's Twitter account, and witnesses who had seen certain photographs on the defendant's and the victim's Facebook pages. Id. at *13. However, we cautioned that "'[t]o the extent that the [d]efendant argues that the State was required to affirmatively prove that the [d]efendant was the author of the message, we agree with reasoning from other jurisdictions that such challenge goes to the weight of the evidence, not its admissibility.'" Id. at *12 (quoting State v. Vermaine M. Burns, No. M2014-00357-CCA-R3-CD, 2015 WL 2105543, at *12 (Tenn. Crim. App. at Nashville, May 5, 2015)).

The present case is similar to Jabriel Linzy in that the State is attributing the Facebook messages to the Appellant. The trial court found that there was ample circumstantial evidence to authenticate the messages. We agree with the trial court. The author of the messages identified himself as "Jeremiah" and "[A.M.'s] dad." Additionally, the Appellant was J.B.'s caseworker, and the author stated that J.B. was in state custody but had run away, both of which were true. The author of the messages offered to pay the victim, so the victim telephoned the Appellant to plan their meeting. The victim said he recognized the Appellant's voice, and video surveillance from the Appellant's bank showed a man matching the description of the Appellant and driving the same car as the Appellant withdrawing money in the hours after the messages were sent. As in Jabriel Linzy, the Appellant had an opportunity to cross-examine the witnesses, and defense counsel argued that someone other than the Appellant could have sent the messages. In fact, during defense counsel's closing argument, he explained to the jury, step by step, how someone could take a person's profile picture and use it to impersonate that person on Facebook. Like Jabriel Linzy, this is a matter of weight of the evidence, and we conclude that there was circumstantial evidence to authenticate the Facebook messages.

## E. Fifth Amendment

The Appellant contends that the trial court erred by limiting his cross-examination of the victim about the victim's recent arrest, by advising the victim of his Fifth Amendment rights, and by allowing the victim to invoke his Fifth Amendment rights. The State argues that the trial court did not err because the Appellant was attempting to ask the victim about an ongoing criminal investigation that was being handled by federal authorities. We conclude that the trial court did not err.

During the victim's cross-examination, defense counsel questioned him about his pending theft case, and the victim acknowledged that the State had offered him diversion. Defense counsel then asked the victim, "Now on March the 7th of 2019, you were arrested again, weren't you?" The victim said yes, and defense counsel asked, "And at that time, you had in your possession . . . 45 caliber rounds -[?]" At that point, the trial court interrupted defense counsel and advised the victim of his constitutional right not to incriminate himself. The trial court asked if the victim had a lawyer in that case, and the victim said yes. The trial court advised the victim that he had a right to consult with his lawyer, that he was testifying under oath, and that anything he said could be used against him in a court of law. The trial court asked if the victim understood his rights, and the victim said yes. Defense counsel resumed his cross-examination and asked the victim, "At the time you were arrested, you had in your possession a black magazine with .45 caliber rounds on your person, is that correct?" The victim responded, "I'm gonna invoke my Fifth Amendment." Defense counsel then asked, "And the passenger seat of the vehicle

- 23 -

that you exited from where you were sitting had a black Sig M-1911 .45 loaded with a silver magazine under that seat?" The victim responded, "I'm not gonna tell about it."

The trial court ruled that the victim had affirmatively invoked his right against compulsory self-incrimination and stated that it was going to "quash further questions regarding facts of any pending case." Defense counsel requested a bench conference. During the conference, defense counsel advised the trial court that the victim may have committed a federal crime by possessing the firearm and ammunition and requested to ask the victim if he had talked with the district attorney's office about "any federal prosecution for that offense." The State responded, "Why? That, that makes the jury know that this is some kind of federal offense, Your Honor, when in fact that case was dismissed . . . because it wasn't found to allege an offense on its face . . . . Our office never even touched it, let alone had a conversation about it." The trial court noted, "If it was dismissed, you can bring that out." However, the trial court then ruled that defense counsel could not ask the victim if he had talked with the district attorney's office about the federal case. Despite that ruling, the State asked the victim on redirect-examination if he knew what happened to the March case, and the victim responded, "I'm pretty sure it got dismissed." The State asked if the victim had ever talked with the district attorney general's office about the March case and if anyone had ever made any promises to him in that case. The victim answered both questions in the negative.

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). "Generally speaking, a denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" State v. Dishman, 915 S.W.2d 458, 463 (Tenn.Crim.App.1995) (quoting State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). Additionally, the right to cross-examine a witness for bias is a fundamental right. State v. Rice, 184 S.W .3d 646, 670 (Tenn. 2006). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). Moreover, "where there is a conflict between the basic right of a defendant to compulsory process and the witness's right against self-incrimination, . . . the right against self-incrimination is the stronger and paramount right." The propriety, scope, manner, and control of the cross-examination of witnesses rests within the discretion of the trial court, and this court will not disturb the limits placed upon cross-examination by a trial court unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

Here, the Appellant attempted to ask the victim about the facts of a federal case for which the victim had been arrested less than three months earlier. Therefore, we conclude that the trial court did not err by advising the victim of his Fifth Amendment Right against compulsory self-incrimination and by allowing the victim to invoke that right. On redirect-examination, the State asked the victim the very same questions that defense counsel had requested to ask him, i.e., whether he had talked to the district attorney's office about that case and whether he had been promised anything in relation to that case. The victim answered both questions in the negative. The Appellant has not explained what more he should have been allowed to ask the victim about the March case. Therefore, he is not entitled to relief on this issue.

## F.  Sentencing

Finally, the Appellant claims that his six-month sentence in confinement is excessive.[5] The State argues that the trial court properly sentenced the Appellant. We agree with the State.

The jury convicted the Appellant on May 23, 2019. That afternoon, the trial court held a misdemeanor sentencing hearing. At the hearing, Dewayne Benjamin Thomas testified for the Appellant that he was a judge in Monroe County Juvenile and General Sessions Court and that he had observed the Appellant in the courtroom as a DCS employee. Judge Thomas said that the Appellant was "very efficient" and "[d]id his job as directed" and that he never heard any complaints about the Appellant. On cross-examination, Judge Thomas testified that since the Appellant's conviction, he could no longer trust the Appellant with a child. Upon being questioned by the trial court, Judge Thomas said the Appellant's duties for DCS mainly related to delinquent matters.

Ann Barker testified that she had been an attorney for almost forty years and that she had worked with the Appellant in juvenile cases. She described the Appellant as "a really conscientious worker" and said he "really cared about the kids." Ms. Barker never heard any complaints about the Appellant. On cross-examination, Ms. Barker testified that she did not attend the Appellant's trial. However, she did not think the Appellant would have done "that."

Jennifer McDaniel, the Appellant's wife, testified that they had been married for twelve years and had one biological child. They became foster parents in 2009 and adopted the last child they fostered, A.M. A.M. was sixteen years old at the time of his adoption and was twenty years old at the time of the Appellant's trial. Mrs. McDaniel said that she

---

[5] At sentencing, the trial court denied judicial diversion. The Appellant does not contest that ruling.

was not aware of any complaints about the Appellant and that "we're still in contact with many of the kids that came through our home."

On cross-examination, Mrs. McDaniel testified that the Appellant worked for DCS for more than one year. Prior to DCS, the Appellant worked in foster care with Omni Visions for about one year. Mrs. McDaniel said that the Appellant sometimes got called away from home in the middle of the night for his work and that she was not with him in the early morning hours of May 24, 2017. She said the Appellant had not been employed since his arrest.

The parties stipulated that the Appellant did not have any prior arrests or convictions. The trial court found that enhancement factor (14), that the defendant abused a position of public trust, applied to the Appellant's sentence. See Tenn. Code Ann. § 40-35-114. The trial court gave the factor "very significant" weight. In mitigation, the trial court applied factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury." Tenn. Code Ann. § 40-35-113(1). The trial court also applied mitigating factor (13), the "catchall" provision, for the Appellant's lack of a criminal history, being married, being "a good worker up until this," and working in the best interest of children in foster care. See Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the Appellant to one hundred eighty days.

As to the manner of service of the sentence, the trial court questioned whether the Appellant could be rehabilitated. The trial court found that confinement was necessary to avoid depreciating the seriousness of the offense and that deterrence was needed because "[w]e've got to prevent people in positions of public trust from abusing that trust" and because "we've got to deter shocking, reprehensible and offensive conduct." The trial court denied the Appellant's request for probation but set the percentage of his sentence to serve in confinement prior to becoming eligible for release into rehabilitative programs at "zero."

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see State v. King, 432 S.W.3d 316, 324 (Tenn. 2014) (applying the Bise standard to "all sentencing decisions"); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the Bise standard to alternative sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to

sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

Regarding alternative sentencing for a felony, a defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). Moreover, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). The following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. See Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

In misdemeanor sentencing, the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). Thus, the trial court is afforded considerable latitude in misdemeanor sentencing. See State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The trial court retains the authority to place a defendant on probation immediately or after a time of confinement. See Tenn. Code Ann. § 40-35-302(a).

The record reflects that the trial court complied with the requirements of misdemeanor sentencing. Therefore, we afford the trial court wide latitude in its ruling. In

determining the length and manner of service of the sentence, the trial court found enhancement factor (14) applicable and gave the factor significant weight. The trial court's comments also demonstrate that it did not think the Appellant was particularly suitable for rehabilitation. The trial court found that the facts of this case were "shocking" and "reprehensible" in that the Appellant was in a position of public trust, deceived his wife and family, targeted a minor who was vulnerable due to his circumstances, and offered the minor money and drugs for a "handjob." We conclude that the trial court did not abuse its discretion by ordering that the Appellant serve one hundred eighty days in jail.

### III.  Conclusion

Based upon the record and the parties' briefs, we conclude that the evidence is insufficient to support the Appellant's conviction of solicitation of a minor to commit sexual battery. Therefore, the Appellant's conviction is reversed and vacated, and the original charge against him is dismissed.

_____
NORMA MCGEE OGLE, JUDGE